Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta,
a la cual se une la Juez Asociada Señora Rodríguez Rodríguez.
Cuando el desempleo condena a mi ser humano y a su familia al hambre o a la indignidad, hay que llegar a límites de exigencia para privarle de la protección que ha ganado acceso a nuestra legislación social. ... Crista-lina debe ser la justificación que se ofrezca para despedirlo sin este mí-nimo abono a los años de servicio que representan la inversión de su único haber en la estructura de producción: sus energías, su capacidad física e intelectual durante los años más fe-cundos, en fin, su salud que declina con el tiempo. (Enfasis nuestro.)(1)
*717 No puedo dar mi aval a la decisión que hoy anuncia la mayoría de este Tribunal. Esta decisión no sólo deja des-amparada a una empleada que dedicó prácticamente toda su vida a la compañía El Telar, Inc., sino que, con toda probabilidad, la convierte en otra de las estadísticas del desempleo, pues, desafortunadamente, cuando un trabaja-dor maduro es despedido, es poco probable que obtenga un nuevo empleo. En esas circunstancias es particularmente importante reconocer que el remedio exclusivo de la Ley Núm. 80 de 1976, según enmendada (Ley Núm. 80) que incluye la mesada y la indemnización progresiva, es un alivio a las serias y detrimentales consecuencias que la pérdida de un empleo provoca principalmente en el em-pleado, pero también, y por lógica repercusión, en su fami-lia y la sociedad en general. Antes de negarle esta exigua compensación a un trabajador que es despedido sin justa causa, el Tribunal debe hacer un análisis ponderado y so-segado en el que considere los propósitos de la Ley Núm. 80. Con respeto, no encuentro este análisis en la opinión de conformidad emitida en este caso.
Quizás más preocupante aún, es que la controversia que está ante nosotros nada tiene que ver con el derecho del patrono a dirigir su establecimiento de la manera más ade-cuada y fructífera a sus intereses económicos, como equivo-cadamente afirma la mayoría. No se cuestiona en este caso la facultad del patrono de tomar decisiones legítimas, in-cluso el cierre por motivos económicos. En vez, este caso está relacionado con el procedimiento adoptado por un pa-trono para discernir qué empleados gerenciales serán man-tenidos en sus puestos, ante un cierre parcial o reducción en empleo. El procedimiento utilizado en este caso y susten-tado por este Tribunal resulta oneroso e irrazonable en su aplicación al interés de la Sra. Nilda Figueroa Rivera y, peor aún, resulta contrario al espíritu y finalidad de la Ley Núm. 80, que es proteger la tenencia del empleo, de acuerdo con el criterio de antigüedad.
*718 Distinto a la mayoría, entiendo que la renuncia de la señora Figueroa Rivera obedeció a un despido tácito, como consecuencia de la arbitrariedad, el capricho y la unilate-ralidad del patrono al implantar su plan de antigüedad. Ese plan posibilitó que una empleada de apenas 6 meses en el empleo resultara más afortunada que la señora Figueroa Rivera, quien laboró gran parte de su vida para El Telar, Inc. Tal realidad es fácilmente constatable con sólo exami-nar el escueto estudio de antigüedad sometido por el Telar. Los hechos pertinentes de este caso validan esta conclusión.
I — I
La señora Figueroa Rivera es residente del pueblo de Guayama. El 19 de mayo de 1988 comenzó a trabajar como cajera en la sucursal “Guayama Pueblo” de El Telar ubi-cada en la calle Calimano de su pueblo de residencia. Nueve años después, específicamente en 1997, la señora Figueroa Rivera fue ascendida al puesto de gerente y asig-nada a la tienda El Telar que se encontraba en el centro comercial Plaza Guayama del mismo pueblo. En este puesto permaneció hasta el 24 de agosto de 2006, fecha cuando renunció. Concretamente, la señora Figueroa Rivera laboró en la corporación El Telar, Inc. durante 18 años.
Durante el 2006, El Telar, Inc. confrontó problemas eco-nómicos que le llevaron a cerrar varias de las sucursales de su tienda en distintos pueblos del país. Como resultado de esto, la compañía procedió a despedir personal gerencial de acuerdo a un plan de antigüedad diseñado exclusivamente para esta clasificación de puesto. Este se estructuró to-mando en consideración los años de servicio del personal gerencial ubicado en todos los establecimientos.
*719 Una de las tiendas cerradas fue la de Plaza Guayama, donde la señora Figueroa Rivera laboraba como gerente.(2) A ella no se le despidió explícitamente, sino que se le tras-ladó como gerente a una tienda ubicada en el pueblo de Mayagüez. Específicamente, El Telar, Inc. le entregó un documento a la señora Figueroa Rivera donde le informaba su reubicación y le solicitaba que manifestara si iba acep-tar el traslado porque de no hacerlo tenía que someter una carta de renuncia.(3) A la señora Figueroa Rivera no se le dio otra opción; o aceptaba el traslado o renunciaba. En este contexto oneroso y hostil, la señora Figueroa Rivera tuvo que renunciar a su plaza. Sin embargo, a la Sra. Carmen Lugo, gerente de la tienda del pueblo de Patillas, que también fue cerrada, se le trasladó a la tienda ubicada en el pueblo de Juana Díaz. Esto a pesar de que la señora Lugo sólo llevaba 6 meses con la compañía. (4)
El 20 de octubre de 2006 la señora Figueroa Rivera pre-sentó una querella por despido injustificado contra El Te-lar, Inc. Al contestar la querella, la compañía alegó, entre otras cosas, que: (1) la señora Figueroa Rivera no había sido despedida; (2) el acto que realizó no constituía un des-pido constructivo; (3) el cierre de la tienda Plaza Guayama se debió a la situación financiera y el buen y normal fun-cionamiento de la empresa; (4) la señora Figueroa Rivera rechazó el traslado; (5) la señora Figueroa Rivera tenía disponible otras alternativas razonables, y (6) no le impu-sieron condiciones de trabajo onerosas a la señora Figueroa Rivera.(5)
*720 La Conferencia con Antelación al Juicio se celebró el 20 de marzo de 2007. Durante ésta se determinó que la con-troversia planteada era exclusivamente de derecho. El caso quedó sometido con el Informe de Conferencia con Antela-ción al Juicio, el Alegato en Torno al Procedimiento (Inco-rrecto) de Despido Utilizado por el Querellado(6) presen-tado por la señora Figueroa Rivera, y la Moción Solicitando se Dicte Sentencia Sumaria, presentada por El Telar, Inc.
El 17 de junio de 2008 el Tribunal de Primera Instancia declaró “con lugar” la querella al concluir que el despido había sido injustificado. El Tribunal ordenó a El Telar, Inc. que indemnizara a la señora Figueroa Rivera con $24,000, computados desde el 19 de mayo de 1988 hasta el 24 de agosto de 2006, más el 25% de esta cantidad por honora-rios de abogado. Entre otras consideraciones, el foro de ins-tancia explicó lo siguiente:

La implementación del estudio de antigüedad del patrono en su aplicación tiene el efecto que empleados en la misma cate-goría con mucho menos tiempo en la empresa quedan ubicados en una mejor plaza que los de mayor antigüedad ....

Nos preguntamos, es o no oneroso para la querellante la alternativa ofrecida por la decisión del patrono. Coincidimos que la actuación del patrono al aplicar su estudio de antigüe-dad tornó el ambiente de trabajo para la querellante oneroso [sic]. Por lo tanto, la renuncia de la querellante es un despido constructivo. (Enfasis nuestro.(7)
De este dictamen, El Telar, Inc. recurrió con un recurso de apelación ante el Tribunal de Apelaciones. Este foro apelativo confirmó, el 29 de agosto de 2009, la sentencia emitida por el tribunal de instancia porque entendió que el *721 despido constructivo de la señora Figueroa Rivera había sido provocado por el plan de antigüedad de El Telar, Inc. Específicamente, el tribunal apelativo concluyó que la apli-cación a la señora Figueroa Rivera del estudio de antigüe-dad ocasionó que ésta renunciara a su puesto “al ser ubi-cada en una tienda en área geográfica distante a su residencia”.(8)
Inconforme, la compañía acudió ante este Tribunal ale-gando que la renuncia de la señora Figueroa Rivera no configuraba un despido constructivo. Pasemos, entonces, a examinar el derecho aplicable a esta controversia.
h-H HH
A. La política pública sobre despido en el ámbito del em-pleo privado
En nuestro país existe una clara política pública laboral dirigida a proteger la tenencia de un empleo. Esta ha sido el resultado de una diversidad de estatutos laborales apro-bados por la Asamblea Legislativa, los cuales pueden agru-parse en dos grandes grupos: aquellos que tienen la finali-dad específica de prohibir el despido y permitir que el trabajador sea reinstalado en su puesto y los que, aunque no prohíben el despido, reglamentan el despido injustifi-cado y conceden como remedio único una indemnización económica. Bajo este último renglón se incluye la Ley Núm. 80, conocida como Ley de Indemnización por Despido Injustificado, que sólo aplica a los empleados del sector privado.
La clara intención de esta legislación, de reglamentar las relaciones obrero-patronales, proteger el derecho del trabajador a la tenencia de su empleo y evitar o desalentar las prácticas de despido injustificado,(9) se revela en su ex- *722 posición de motivos. Sobre este particular, el precepto ma-nifiesta lo siguiente:
Ya es tiempo que se proteja de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo mediante la aprobación de una ley que a la vez que otorgue unos remedios más justicieros y consubstanciales con los da-ños causados por un despido injustificado desaliente la inci-dencia de este tipo de despido. (Enfasis nuestro.)(10)
Tan profunda era la preocupación de la Legislatura de proveer estabilidad laboral en sus empleos a los trabajado-res, brindarles mayor seguridad en el empleo y disuadir a los patronos de los despidos arbitrarios y caprichosos, que durante el 2005 enmendó la Ley Núm. 80 para aumentar la indemnización económica a los obreros que eran despe-didos en contra de las disposiciones del estatuto. El propó-sito de los legisladores para tomar esta acción se hace evi-dente en el texto siguiente:
El beneficio que provee la Ley Núm. 80, ante, a las partes in-volucradas, resulta un remedio impráctico para los trabajado-res que son los que rinden, con su conocimiento y dedicación a la empresa, la plusvalía de su trabajo. La protección de la Ley Núm. 80, supra, se ha probado que es un remedio poco efectivo para el empleado despedido sin justa causa en comparación con los beneficios que recibe la empresa al despedir al obrero.
En los últimos años ha proliferado la práctica en las empre-sas privadas de despedir trabajadores sin justa causa cuando éstos llevan quince (15) o más años en la empresa. Como tienen que compensarlo con las indemnizaciones que dispone la Ley Núm. 80, antes cita, le resulta más barato despedirlo y pa-garle la mesada, que mantener un empleado cuyo sueldo y retiro más cercano le redundaría en gastos mayores. Al despe-dirlo, aunque cumpla con la ley, deja al empleado sin trabajo y con más de un sesenta (60) por ciento de probabilidades de no poder encontrar otro. De esa forma esta persona, en edad toda-vía productiva, entra a formar parte de los miles de desemplea- *723 dos que hacen fila para recibir ayuda gubernamental. (Énfasis nuestro.)(11)
Más concretamente, el espíritu de esta medida se puede apreciar en los debates legislativos que se suscitaron antes de que se aprobara. Veamos una de estas expresiones le-gislativas:
Sr. Reyes Oppenheimer: ... No se trata pues, solamente de un medio de subsistir, sino además del instrumento en virtud del cual se forma la vida familiar. Se proporciona algún bien o servicio a otros. A la vez se propicia que la persona actualice su potencial humano y se haga más persona.
Es necesario recordar la importancia vital que tienen los em-pleos para los trabajadores, haciendo una analogía con la es-fera penal, el despido, el despido equivale a la pena de muerte. Cuando el despido se hace en forma caprichosa, atenta a la integridad y dignidad del ser humano.
... La aprobación de esta medida desalentaría los despidos que se hacen de forma caprichosa y arbitraria. En menosprecio de lo mejor que tiene nuestra economía su mano de obra. La com-pensación por despido injustificado hará un balance entre el desarrollo económico y los derechos de los trabajadores, des-alentando y penalizando la práctica de despidos arbitrarios que no tienen relación con el desempeño y las operaciones del patrono.
Debemos entender que la política pública detrás de la mesada, es el de disuadir el despido injustificado y no como un precio que el patrono está dispuesto a pagar por un obrero sin justi-ficación alguna. (Énfasis nuestro.)(12)
Sin duda, la Ley Núm. 80 es reflejo del interés apre-miante que tiene el Estado de evitar las prácticas injustas del trabajo en el ámbito de las relaciones obrero patrona-les, entorno donde la parte más débil siempre será el obrero.(13) Como toda ley laboral, está orientada a promo-ver la justicia social de la clase trabajadora, garantizando *724 la mayor protección de sus derechos laborales.(14) Su esen-cia es remedial o reparadora, por lo cual su interpretación judicial debe ser liberal y amplia para que se puedan al-canzar los objetivos que la originaron(15) En este proceso interpretativo, toda duda en cuanto a la aplicación de una disposición legal laboral deberá resolverse a favor del empleado(16)
B. Elementos para activar la causa de acción por despido injustificado
Para que una persona pueda reclamar ante un foro judicial que fue despedida injustificadamente y, por lo tanto, llevar una acción al amparo de la Ley Núm. 80 tiene que alegar en su querella que: (1) era empleada de comercio, industria o cualquier otro negocio o sitio de empleo;(17) (2) estaba contratada sin tiempo determinado; (3) recibía una remuneración; (4) fue despedida de su cargo, y (5) no medió una justa causa(18) Limitaré mi discusión a los últimos dos elementos porque en este caso no existe controversia sobre los primeros tres requisitos.
En el marco de las relaciones obrero patronales el des- *725 pido se entiende como “la ruptura o disolución del contrato o relación de trabajo por declaración de voluntad unilateral del patrono o empresario, que de tal modo extingue el vín-culo que lo une con el trabajador a su servicio”.(19) Este concepto se visualiza ampliamente en la Ley Núm. 80 por-que, además de establecer lo que constituye un despido clásico o tradicional, el estatuto incluye “otras acciones que, por sus efectos, equivalen a despidos”.(20) Específica-mente, la medida conceptúa el término despido de la ma-nera siguiente:
... se entenderá por despido, además de la cesantía del em-pleado, su suspensión indefinida o por un término que exceda de tres (3) meses, excepto en el caso de empleados de industria y negocios estacionales o la renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a re-nunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en ca-tegoría o someterlo a vejámenes o humillaciones de hecho o de palabra. (Énfasis nuestro.)(21)
De este texto se pueden visualizar tres modalidades de despidos: (1) el tradicional, (2) la suspensión, y (3) la re-nuncia obligada provocada por el patrono. En lo perti-nente, la tercera modalidad de despido, conocida como tá-cito o “constructivo”,(22) es una ficción legal porque permite que una renuncia sea tratada por los tribunales como un despido explícito, siempre que ésta sea el resultado de cambios severos en las condiciones de trabajo de un empleado. En otras palabras, el foro judicial infiere la exis-tencia de un despido, a partir de la conducta ilícita del patrono.
*726 Esta figura jurídica tiene su origen en el derecho común donde se le denominó como “constructive discharge”. (23) Ésta se comenzó a utilizar en controversias de relaciones obrero-patronales al amparo de la Ley Nacional de Relacio-nes del Trabajo de los Estados Unidos (N.L.R.A., por sus siglas en inglés).(24) Concretamente, la Junta Nacional de Relaciones del Trabajo (N.L.R.B., por sus siglas en inglés) utilizó, por primera vez, el término despido constructivo en 1938,(25) aunque no fue hasta 1976 que se elaboraron los dos elementos necesarios para que se configurara la causa de acción por despido constructivo. Ese año, la N.L.R.B. determinó que para reclamar un despido constructivo, en el contexto de relaciones laborales colectivas, era necesario probar: (1) que las condiciones impuestas por el patrono eran de tal naturaleza que obligaban al empleado a renun-ciar y (2) que esta carga onerosa se imponía por las accio-nes sindicales del empleado. (26)
*727 Esta doctrina evolucionó y se amplió su aplicación a todo tipo de controversias de despidos ilegales, particular-mente los relacionados con discrimen al amparo del Título VII de la Ley de Derechos Civiles(27) Por ejemplo, despidos relacionados con discrimen por sexo, edad, raza, religión, hostigamiento sexual, entre otros. En este contexto, los tribunales estatales y federales han elaborado dos estándares para aplicar la doctrina de despido constructivo a contro-versias de discrimen. Estos son: (1) el de la persona razo-nable (Reasonable Person Standard) y (2) el de la intención patronal (Employer Intent Standard). De acuerdo con el Prof. George W. Bohlander, hay una tendencia mayoritaria entre los tribunales apelativos federales para favorecer el primer estándar(28) Inclusive, el Tribunal Supremo de Es-tados Unidos ha aceptado el estándar de la persona razo-nable como el apropiado para adjudicar controversias de despido constructivo en el contexto de discrimen(29)
Según el estándar de persona razonable basta probar que las acciones del patrono inducen al empleado a renun-ciar antes que aceptar las condiciones onerosas o intolera-bles impuestas. Específicamente, en los casos de discrimi-nación ilegal, en los que se reclame el despido constructivo, se debe establecer un nexo entre el acto discriminatorio y las condiciones intolerables de trabajo impuestas por el *728 patrono. En ausencia de este nexo, aunque se demuestre el acto de discriminación ilegal, no se sostendrá automática-mente el reclamo de despido constructivo. (30)
Distintamente, bajo el estándar de intención patronal se requiere que el empleado querellante, además de probar que las condiciones de trabajo son intolerables para una persona razonable, establezca que subyacente a las accio-nes del patrono está la intención de forzar el despido. Nada impide, sin embargo, que ello se pueda probar a través de las inferencias a las que llegue el tribunal al aquilatar la prueba.(31)
Este Tribunal ha interpretado la doctrina de despido constructivo de forma similar al estándar de persona razo-nable utilizado por los foros judiciales de Estados Unidos. Concretamente, desde 1967, hemos establecido que “los ac- *729 tos voluntarios e injustificados de un patrono, encamina-dos a obligar al empleado a dejar su cargo, constituyen un despido cuando la única alternativa razonable que queda al empleado es la de abandonar el cargo”.(32) Los profesores Zeno García y Bermúdez Pérez coinciden con esta aprecia-ción al expresar que “se entenderá que ha ocurrido este tipo de despido, siempre que una persona razonable ante circunstancias similares sienta que se le está forzando a renunciar y no de acuerdo a la visión subjetiva que pudiese tener el empleado individualmente”. (Enfasis nuestro.)(33)
El Departamento del Trabajo y Recursos Humanos (De-partamento del Trabajo) adoptó esta definición jurispru-dencial y la estructuró en dos elementos principales:
1) Las acciones del patrono deben exhibir un nivel de seriedad considerable....
2) El empleado no debe tener disponible otra alternativa que no sea la renuncia para resolver la situación adversa que en-frenta en el trabajo.(34)
Respecto al segundo requisito, el Departamento del Tra-bajo aclara que se activa una excepción a la norma general que requiere agotar alguna opción razonable, antes de to-mar la determinación de renunciar, cuando “la acción del patrono crea una condición de riesgo para la vida o la sa-lud, tanto mental como física del empleado”.(35) Ante esta consideración, “no resulta necesario agotar el remedio exis-tente si el mismo no garantiza la eliminación inmediata de dicho riesgo”. (36)
*730 Como es observable, no cualquier molestia, condición antipática o circunstancia estresante en el empleo puede cualificar como un despido tácito, de forma que el trabaja-dor quede protegido por el remedio que provee la Ley Núm. 80. Es necesario que las actuaciones del patrono, ya sean cambios onerosos en las condiciones de trabajo, traslados, reducciones de salarios o descenso en el puesto, sean arbi-trarias, irrazonables y caprichosas.(37) Además, deben ser situaciones que le creen al empleado un ambiente de tra-bajo hostil, intimidante u ofensivo, que no estén funda-mentadas “en gestiones administrativas legítimas” y que lesionen sus condiciones de trabajo.(38) Para el profesor Bo-hlander un ejemplo de una condición de trabajo intolerable es trasladar a un empleado aumentándole marcadamente el tiempo requerido para llegar a su lugar de trabajo, (39) Los profesores Baxter y Farrell coinciden con esta aprecia-ción y proveen otros criterios que deben ser ponderados para determinar si la renuncia provocada por un traslado puede constituir un despido constructivo. Específicamente, los profesores exponen:
In determining whether a proposed transfer or demotion constitutes conditions intolerable enough to support a finding of constructive discharge by an employee who leaves a job, courts will compare the offered job with the job the employee had. The comparison will focus on differences in pay and benefits, as well as other day to day conditions, increased travel requirements, increased commuting time, etc. Courts will also consider whether the transfer or demotion constitutes a blow to one’s prestige or involves embarrassment (although these factors will not constitute an intolerable condition unless their effect is great). In evaluating embarrassment claims, courts seek to find out whether the embarrassment would be daily and unavoidable and whether there is a radical change in job responsabilities (e.g., taking away an employee’s responsibi *731 lity for policy-making decisions). Courts emphasize that the standard for evaluating claims of intolerable working conditions caused by a transfer or demotion is an objective one, and that mere dislike of the new job is not a difficult or unpleasant enough condition that a person is privileged to quit.(40)
Concretamente, para determinar si hay un despido im-plícito, primero, la prueba debe demostrar, “mediante infe-rencia razonable, que la única alternativa razonable del empleado es abandonar su empleo”, como lógico resultado de las condiciones de trabajo intolerables, irrazonables, in-justas y a tal punto onerosas que le impuso su patrono.(41) Ante estas circunstancias, el empleado, como persona ra-zonable, prefiere renunciar que tolerar las desfavorables condiciones de trabajo impuestas. Es decir, la renuncia del empleado debe considerarse como una consecuencia razo-nablemente previsible de las acciones del patrono.
Otro elemento por considerar es si el patrono puede jus-tificar su actuación. Esto implica que el patrono debe pro-bar que no tenía otras alternativas menos onerosas para ofrecer al empleado que no le resultaran perjudiciales al normal funcionamiento de su negocio. Como regla general, si el patrono no logra justificar su actuación, este tipo de despido será injustificado.(42) Al examinar este factor, el Tribunal debe partir de la premisa de que los patronos son personas razonables en la toma de decisiones en su empresa.(43)
*732 El Departamento del Trabajo sugiere algunas circuns-tancias que, de acuerdo a la situación fáctica del caso, pue-den examinarse para determinar si la actuación del pa-trono es razonable y justificada. Estas son: “(1) [l]a condición económica de la empresa, (2) [l]os cambios tecno-lógicos o de cualquier otra forma que se han realizado en la empresa, (3) [e]l desempeño y la eficiencia del empleado en su puesto, (4) [e]l nivel de compensación del empleado, es-pecialmente si se le compara con empleados que ocupan una posición similar en la empresa o en otras empresas similares, (5) [l]as condiciones de trabajo de los demás em-pleados de la empresa y especialmente de los empleados que ocupan una posición similar, (6) [a]ntigüedad del empleado”.(44) Cada una de estas consideraciones repre-senta las posibles razones que el patrono puede utilizar para justificar su actuación.(45)
En el caso ante nuestra consideración, para definir si la actuación de trasladar a la señora Figueroa Rivera fue jus-tificada y razonable se deben evaluar, principalmente, tres factores: (1) la condición económica de El Telar, Inc. y la decisión de cierre, (2) la reducción parcial de personal y (3) el elemento de la antigüedad.(46) En este examen, la prueba ofrecida por el patrono nos debe llevar a concluir que no tenía otra alternativa menos onerosa que beneficiara a la empleada y que no le afectara el funcionamiento de su *733 negocio. Es decir, tenemos que concluir que el patrono cum-plió con la Ley Núm. 80. Si el patrono no logra demostrar su cumplimiento, será responsable por despido constructivo y tendrá que pagar la “mesada”.
Varias de las situaciones señaladas por el Departa-mento para determinar la razonabilidad y justificación de la actuación patronal, surgen de las circunstancias parti-culares que la Ley Núm. 80 menciona como posibles causas justificadas para el despido. Éstas se sustentan en la pre-rrogativa que tiene el patrono de despedir a un trabajador, siempre que el despido obedezca a una razón gerencial y no sea producto de su arbitrariedad y capricho. Sobre este particular, la normativa específicamente dispone que será justa causa para el despido de un empleado lo siguiente:
a. Que el obrero siga un patrón de conducta impropia o desordenada.
b. La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.
c. Violación reiterada por el empleado de las reglas y regla-mentos razonables establecidos para el funcionamiento del es-tablecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
d. Cierre total, temporero o parcial de las operaciones del establecimiento.
e. Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios rendidos al público.
f. Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganan-cias, anticipadas o que prevalecen al ocurrir el despido.(47)
Las primeras tres situaciones son provocadas por la con-ducta del empleado. Mientras, las próximas tres son actua-ciones del patrono, motivadas por razones económicas, dirigidas a la administración de su negocio. Ambos grupos de *734 causales deben estar vinculadas al buen y normal funcio-namiento de la empresa para que el despido sea conside-rado con justa causa. Al respecto, la normativa dispone que no se considerara justificado un despido que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento.(48)
La controversia de este caso se centra en las causales (d) y (f). Es decir, en el cierre de algunas tiendas de El Telar, en la reducción de personal por motivo del cierre y en un alegado despido constructivo por el diseño e implantación arbitraria y caprichosa de un estudio de antigüedad para hacer efectivo los cierres. En cuanto a esto, la Ley Núm. 80 dispone que:
En cualquier caso en que se despidiesen empleados por las razones indicadas en los incisos (d), (e) y (f) de la sec. 185b de este título, el patrono estará obligado a retener con preferencia en el empleo a los empleados de más antigüedad siempre que subsistan puestos vacantes u ocupados por empleados de me-nos antigüedad en el empleo dentro de su clasificación ocupa-cional que puedan ser desempeñados por ellos, entendiéndose que se dará preferencia a los empleados despedidos en caso de que dentro de los seis (6) meses siguientes a su cesantía tu-viere necesidad de emplear a una persona en labores iguales o similares a las que desempeñaban dichos empleados al mo-mento de su despido y dentro de su clasificación ocupacional siguiéndose también el orden de antigüedad en la reposición excepto, y en ambas situaciones, en aquellos casos en que haya una diferencia clara o inconcursa en favor de la eficiencia o capacidad de trabajadores comparados en cuyo caso prevale-cerá la capacidad.(49)
Este precepto establece, como un derecho, la retención de todo empleado que tenga mayor antigüedad en la empresa. Por lo cual, para que la acción del patrono de cerrar y re- *735 ducir personal sea justificada y, por ende, válida, éste de-berá respetar el orden de antigüedad de los trabajadores. Para cumplir con esta obligación, el patrono debe utilizar su prerrogativa gerencial de diseñar un estudio de antigüedad. Este plan de antigüedad no puede ser contra-rio a la finalidad de la Ley Núm. 80 que es proteger la tenencia de empleo de aquellos trabajadores que tienen más tiempo laborando en la empresa. Esto porque el estatuto presume que al aplicar o implantar sus disposiciones el patrono va a actuar sin arbitrariedad o capricho.
Para calcular la antigüedad del empleado, la Ley Núm. 80 establece dos criterios. Según el primero, los años de servicios se computan tomando en consideración el tiempo en la oficina, fábrica, sucursal o planta donde se va hacer la reducción de personal, porque los empleados no son tras-ladados entre componentes de la empresa y cada uno de éstos funciona de manera independiente en cuanto a los asuntos de personal. El segundo criterio toma en conside-ración el tiempo invertido en todas las oficinas, fábricas, sucursales o plantas dentro de la clasificación ocupacional donde se va hacer la reducción de personal, porque son usuales los traslados de empleados entre unidades y se opera de forma integrada en cuanto a los aspectos de personal.(50) Este segundo criterio es el que le aplica a la controversia que está ante nuestra consideración. Por eso, para determinar la antigüedad de sus empleados, El Telar, Inc. consideró todo el tiempo que éstos llevaban laborando en la compañía.
Claro está, la ley también establece que se podrá utili-zar el criterio de eficiencia o capacidad, tanto en el orden de los despidos como en la retención, siempre que exista una diferencia clara que lo justifique.(51) En ese sentido, el *736 criterio de “eficiencia o capacidad reviste un valor secun-dario al de la antigüedad”.(52) De acuerdo con el Departa-mento del Trabajo, esta conclusión
... obedece al hecho de que cuando un grupo de personas se han desempeñado por un período de tiempo en una clasifica-ción ocupacional, se entiende que todos cumplen en términos generales con los requisitos para ocupar la plaza cubriendo unos niveles mínimos de excelencia. Por lo tanto, si la acción del patrono sólo consiste en una reducción de la fuerza obrera, entonces el requisito que como norma regula el orden prefe-rente de cesantía y reempleos es la antigüedad.(53)
En este caso, El Telar, Inc. no alegó ni probó que era necesario sustituir el criterio de antigüedad por el de capa-cidad o eficiencia. Por lo tanto, al evaluar la implantación del estudio de antigüedad, con relación a la señora Figueroa Rivera, será necesario observar si el patrono cumplió con la finalidad de la Ley Núm. 80 que persigue retener en el puesto a los empleados de mayor antigüedad.
Inmediatamente se cumple con cada uno de los requisi-tos previamente mencionados, es decir, ser un empleado de negocio, a tiempo indeterminado, con remuneración y des-pedido sin justa causa, se activa en el proceso judicial una presunción legal de que el despido es ilegal o injustifi-cado.(54) Esta regla fue reafirmada por la Asamblea Legis-lativa en una de las enmiendas realizadas a la Ley Núm. 80.
*737 Dicha legislación tuvo el propósito de conferir mayor protec-ción en el empleo a los trabajadores, al establecer una presun-ción, rebatible, de despido injustificado y el derecho a una in-demnización, conocida comúnmente como “mesada”, en aquellas situaciones en las que el patrono no pudiese estable-cer, a satisfacción del Tribunal, la existencia de justa causa para el despido.(55)
Ante esta presunción, al contestar la demanda el pa-trono tiene la obligación de alegar “los hechos que dieron origen al despido y probar que el mismo estuvo justifica-do”, de manera que pueda quedar exento de la responsabi-lidad económica que impone la Ley Núm. 80 a todo patrono que despide sin justa causa a un empleado.(56) Esto signi-fica que, contrario a la norma general, en los casos donde se presente la causa de acción por despido injustificado al am-paro de la Ley Núm. 80, será el patrono y no el reclamante quien tendrá el peso de la prueba para establecer que el despido fue justificado. (57)
Las Reglas de Evidencia claramente disponen que, en los casos civiles, si la persona contra la cual se establece la presunción no presenta evidencia para rebatir el hecho presumido, el juzgador está obligado a deducirlo, quedando tal hecho establecido. Por el contrario, si la parte contra la cual se establece la presunción, presenta evidencia en apoyo de la determinación de la no existencia del hecho, la parte a la cual le favorece la presunción debe persuadir al juzgador de que el hecho presumido sí existe.(58)
La carga probatoria del patrono para rebatir la presun-ción de despido injustificado, es decir, para demostrar la inexistencia del hecho presumido, será el de preponder-ancia. *738 (59) En ese sentido, el patrono tiene la obligación de probar y persuadir al juzgador respecto a que el despido fue justificado.(60) Si el patrono revierte esta presunción, el em-pleado tiene que presentar prueba de refutación para esta-blecer que el despido fue injustificado.(61) Si el empleado no logra probar que se trató de un despido injustificado, el patrono prevalece y se libera del pago de la mesada. Por el contrario, si el patrono no cumple con la carga probatoria, el foro judicial tiene que concluir que el despido fue arbi-trario y caprichoso, es decir, injustificado.
Concretamente, en un caso donde un empleado alegue que su renuncia debe considerarse un despido constructivo, el patrono debe alegar y probar que su actuación fue razo-nable, justificada y que no tenía otras alternativas menos onerosas que ofrecer al empleado y que, a la vez, no impi-dieran el normal funcionamiento de su negocio. Lo particular de esta modalidad de despido es que sólo se activa cuando, entre otros factores, se concluye que la actuación del patrono fue injustificada. Dentro del mismo concepto jurídico, contrario a las otras variantes de despido, está inmerso su rechazo a lo injustificada o arbitraria de la ac-ción realizada por el patrono. Por lo cual, si se establece que hay un despido constructivo, será obligatorio concluir que éste es injustificado.
rH hH I — i
En este caso se ha configurado un despido constructivo. Basta con examinar brevemente el expediente para darse cuenta de esto. La señora Figueroa Rivera no fue separada de su puesto de gerente y de su empleo de forma tradicio- *739 nal, es decir, no hubo un despido explícito en el que El Telar, Inc. unilateralmente le manifestara que quedaba ce-sante de su puesto. La señora Figueroa Rivera renunció a su trabajo, después de 18 años en la compañía El Telar, Inc., no por su gusto, sino porque las nuevas condiciones de trabajo impuestas por su patrono eran intolerables. En este caso, es necesario establecer si su renuncia constituye un despido implícito o tácito provocado por las acciones y de-cisiones de su patrono. Es decir, se necesita determinar si la actuación de El Telar, Inc. de trasladarla de Guayama a Mayagüez para realizar su trabajo le resultó onerosa, si su única opción razonable era renunciar y si el patrono tenía otras alternativas menos onerosas que evitaran su determinación. Si el patrono no tenía otras alternativas, estamos en la obligación de considerar que se trató de una medida legítima y justificada. Por el contrario, si tenía otras alternativas, entonces su determinación fue capri-chosa e injustificada. Este análisis se realiza para discer-nir si la señora Figueroa Rivera tiene derecho a la mesada y a la indemnización progresiva que concede la Ley Núm. 80. En nuestro caso, el análisis revela que, efectivamente, su despido fue injustificado.
La señora Figueroa Rivera reside en el pueblo de Gua-yama, lugar donde también trabajaba en la tienda El Telar. Su renuncia fue provocada porque El Telar, Inc., al cerrar la tienda de Plaza Guayama, lugar en el que laboraba como gerente, determinó que sería trasladada como ge-rente a la tienda del pueblo de Mayagüez y que, de no aceptar, tendría que renunciar.
Es obvio que la determinación unilateral de El Telar, Inc. resulta onerosa para la señora Figueroa Rivera. Antes, la señora Figueroa Rivera llegaba a su trabajo desde su casa en aproximadamente 10 minutos. Ahora, con su tras-lado, El Telar, Inc. impone a la señora Figueroa Rivera alguna de las acciones siguientes: (1) vender su casa en el pueblo de Guayama y reubicar su residencia en Mayagüez, *740 o (2) alquilar otra residencia en Mayagüez, o (3) viajar en-tre 2V2 y 3 horas desde su casa hasta su trabajo y viceversa.
Si la señora Figueroa Rivera optara por viajar todos los días, esto significaría la inversión de por lo menos 5 horas diarias en transportación, tendría que gastar una cantidad significativa de su sueldo en combustible y en el manteni-miento de su vehículo para que éste se encuentre en con-diciones óptimas para transitar. Además, la cantidad de horas invertidas en viajar le restaría al tiempo que la se-ñora Figueroa tiene para descansar y ciertamente aumen-taría su cansancio físico, lo cual puede afectar, a su vez, sus relaciones con sus familiares, las responsabilidades en el hogar e inclusive en su trabajo, entre otros. También, el mantenerse más tiempo conduciendo, aumenta la posibili-dad de que la señora Figueroa Rivera pueda tener un acci-dente en la carretera.
De igual forma, si la señora Figueroa Rivera optara por cualquiera de las otras formas para reorganizar su vida, mencionadas anteriormente, todas serían igualmente one-rosas tanto para ella como para toda su familia. Por eso, este traslado representa un cambio sustancial y severo en las condiciones de trabajo y la vida de la señora Figueroa Rivera. Sin duda, la inversión de recursos económicos para trabajar haría insignificante la remuneración que ésta re-cibe, que de hecho es el salario mínimo, $7.50 la hora. Esto no es una mera molestia o situación antipática, es la des-trucción de la estabilidad emocional, económica y laboral de esta empleada.
Ante la disyuntiva impuesta por su patrono, ¿tenía otra alternativa razonable la señora Figueroa Rivera, más allá de renunciar? Es evidente que no. El Telar, Inc. la indujo a renunciar y así se lo hizo ver cuando le entregó un docu-mento donde le informaba su reubicación y le solicitaba que manifestara si iba aceptar el traslado. Si no lo aceptaba, *741 tenía que entregar su carta de renuncia.(62) La determina-ción de la señora Figueroa Rivera de renunciar a su puesto es la que tomaría cualquier persona razonable en su situa-ción y es un resultado previsible a las determinaciones de su patrono de imponerle un traslado oneroso. Al hacer sus condiciones de trabajo intolerables, El Telar, Inc. la indujo a renunciar. De esa forma, se configura un despido cons-tructivo que por sus características resulta injustificado, caprichoso e impermisible de acuerdo con la doctrina labo-ral porque, como veremos, el patrono tenía varias alterna-tivas que ofrecerle a la señora Figueroa Rivera.
Luego de establecer que la actuación voluntaria de El Telar, Inc. de trasladar a la señora Figueroa Rivera para Mayagüez representó para ésta una condición en extremo onerosa y determinar que su única opción viable era la renuncia, es necesario examinar si la actuación del patrono es justificada y razonable. Esto tomando en consideración si El Telar, Inc. no tenía otras alternativas menos onerosas que no fueran incompatibles con el normal funcionamiento de su negocio. Al evaluar este aspecto, el Tribunal debe partir de la premisa de que los patronos actúan de forma razonable cuando toman decisiones que impactan su negocio.
El Telar, Inc. tuvo que cerrar algunas de sus tiendas por motivos económicos. Esto ocasionó que tuviera que reducir su personal gerencial y el resto de sus empleados. Como parte de su prerrogativa gerencial, El Telar, Inc. diseñó un plan de antigüedad para cada una de las clasificaciones ocupacionales, gerenciales y no gerenciales. Bajo la lógica de éste, era razonable pensar que los empleados de mayor antigüedad debían ser retenidos sobre los que tuvieran me-nos antigüedad.
Del plan de antigüedad se puede observar que la tienda *742 de Patillas fue cerrada el 21 de agosto de 2006. Mientras, la de Plaza Guayama fue cerrada dos días más tarde, el 23 de agosto de 2006. En la tienda de Guayama, laboraba la señora Figueroa Rivera, quien tenía 18 años de antigüe-dad, mientras en la tienda de Patillas trabajaba la señora Lugo que tenía apenas 6 meses de trabajo y antigüedad acumulados. La implantación del estudio de antigüedad, tuvo el efecto práctico de trasladar a la empleada con más antigüedad al pueblo Mayagüez, mientras transfirió a la de menos antigüedad al pueblo de Juana Díaz, ciudad que está apenas a media hora de Guayama. Esto provocó la renuncia de la señora Figueroa Rivera, una consecuencia que el patrono podía razonablemente prever. Todo esto se suscitó, a pesar de que al momento del cierre de Plaza Gua-yama, tanto el puesto de gerente de la tienda de Juana Díaz como la de Mayagüez, estaban ocupados por personas que llevaban sólo seis meses trabajando para la compañía. Am-bas gerentes, la señora Lugo de Juana Díaz y la Sra. Ari-selis Sánchez Vadi de Mayagüez, comenzaron a laborar en El Telar en la misma fecha, el 13 de febrero de 2006.(63)
La actuación originalmente legítima de El Telar, Inc., de cerrar por motivos económicos varias de sus tiendas, se con-virtió en injustificada e irrazonable cuando, al aplicar su plan de antigüedad, incumplió y no respetó la intención de la Ley Núm. 80 de proteger la tenencia del empleo de aque-llos empleados que tuvieran mayor antigüedad. Es decir, a la señora Figueroa Rivera no se le protegió el derecho de retención que le concede la Ley Núm. 80 por tener 18 años de servicio laborando para El Telar, Inc. Esto a pesar de que el estatuto impone al patrono la obligación de retener a los empleados de mayor antigüedad siempre que hayan *743 puestos vacantes u ocupados por trabajadores de menor an-tigüedad en la misma clasificación ocupacional. Esto no implica que los empleados tengan un derecho a que se les ubique en el lugar geográfico que deseen. De lo que se trata es de su derecho a ser retenidos en las condiciones explíci-tas que dispone le Ley Núm. 80.
Ante esta situación fáctica, es obligatorio cuestionarnos, ¿tenía El Telar, Inc. otras alternativas que resultaran me-nos onerosas que el traslado de la señora Figueroa Rivera a Mayagüez y, a la vez, fueran compatibles con el buen funcionamiento de la compañía? De entrada es evidente que sí. El Telar, Inc. tenía la opción de cumplir con la Ley Núm. 80 de 1976 de dos maneras: (1) trasladando a la señora Figueroa Rivera a la tienda de Juana Díaz y cesan-teando a la señora Lugo, quien tenía mucho menos antigüe-dad, o (2) trasladando a la señora Figueroa Rivera a la tienda de Guayama Pueblo, enviando a la gerente de esa tienda, que según las determinaciones de hechos del foro de instancia tenía 5 años con la compañía, a la.de Juana Díaz y cesanteando a la señora Lugo. De esta manera, se hu-biera respetado el derecho de retención de la señora Figueroa Rivera utilizando el criterio primordial de la antigüedad.(64) Al existir otras alternativas a la opción im-puesta por El Telar, y éstas no interferir o afectar el normal funcionamiento del negocio, es obligatorio concluir que la actuación de El Telar, Inc. de trasladar a Mayagüez a la señora Figueroa Rivera fue injustificada y caprichosa.
Como se cumplen todos los elementos para configurar un despido constructivo, me parece evidente que la Mayo-ría se equivoca al revocar la sentencia del Tribunal de Apelaciones. En vez, confirmaría la sentencia y le ordena-ría a El Telar, Inc. que indemnizara a la señora Figueroa *744 Rivera en la cantidad de $24,000, equivalente a la mesada computada desde que inicio sus labores con El Telar, Inc., el 19 de mayo de 1988, hasta la fecha de su renuncia el 24 de agosto de 2006, más 25% por honorarios de abogado.

 Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 547 (1979).

 Según el “Estudio de Antigüedad” la sucursal de El Telar en Plaza Guayama fue cerrada el 23 de agosto de 2006. Estudio de Antigüedad de Gerentes, Apéndice del recurso de Apelación, pág. 42.

 Véase Decisión referente al Traslado de Tienda por Motivo de Cierre de Tienda Plaza Guayama, 24 de agosto de 2006, Apéndice de la Petición de certiorari, pág. 99.

 Estudio de Antigüedad, Apéndice del recurso de Apelación, supra.

 Apéndice de la Petición de certiorari, págs. 20-22.

 En este escrito, la señora Figueroa Rivera argumentó que el acto de trasla-darla a la tienda El Telar en Mayagüez, al ser oneroso, fue la causa que la obligó a renunciar. Ante esta realidad y la negativa del patrono de reubicarla en la plaza de gerente de la tienda Guayama Pueblo, a pesar de que la gerente de esa tienda tenía menor antigüedad en la empresa, la señora Figueroa Rivera alega que se configuró un despido constructivo. Alegato en Torno al Procedimiento (Incorrecto) de Despido Utilizado por el Querellado, Apéndice de la Petición de certiorari, págs. 38-41.

 Sentencia del Tribunal de Primera Instancia, Apéndice de la Petición de certiorari, pág. 16.

 Apéndice de la Petición de certiorari, pág. 9.

 Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364, 374 (2001). Véanse: R.N. Delgado Zayas, Apunte para el estudio de la legislación protectora del trabajo en el *722 derecho laboral puertorriqueño, San Juan, [ed. del autor], 2005, págs. 127-128; C. Zeno Santiago y V.M. Bermudez Pérez, Tratado de Derecho del Trabajo, Puerto Rico, Pubs. J.T.S., 2003, T. I, pág. 35.

 Exposición de Motivos de la Ley Núm. 80, según enmendada, 1976 Leyes de Puerto Rico 268.

 Exposición de Motivos de la Ley Núm. 128 de 7 de octubre de 2005 que enmendó la Ley Núm. 80 de 1976.

 Diario de Sesiones, P. de la C. 631 que se convirtió en la Ley Núm. 128 de 7 de octubre de 2005, págs. 2-3.

 C. Zeno Santiago, El Despido y la política social en nuestro estado de dere-cho, 34 (Núm. 2) Rev. Jur. U.I.P.R. 213 (2000).

 Adventist Health v. Mercado, 171 D.P.R. 255 (2007); Cintrón v. Ritz Carlton, 162 D.P.R. 32, 39 (2004).

 Arce Buceta v. Motorola, 173 D.P.R. 516 (2008); Adventist Health v. Mercado, supra; Torres Santiago v. Mun. de Coamo, 170 D.P.R. 541 (2007); Muñoz Hernández v. Policía de P.R., 134 D.P.R. 486, 496-497 (1993); Martínez Reyes v. Tribunal Superior, 104 D.P.R. 407, 411 (1975). Véanse, además: R.E. Bernier y J.A. Cuevas Sega-rra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan Pubs. J.T.S., 1987, Vol. 1, pág. 455; Zeno Santiago y Bermúdez, op. cit., págs. 27 y 94; Delgado Zayas, op.cit., pág. 15.

 Arce Buceta v. Motorola, supra; Adventist Health v. Mercado, supra; Torres Santiago v. Mun. de Coamo, supra; García Burgos v. A.E.E.L.A., 170 D.P.R. 315 (2007); Jiménez, Hernández v. General Inst., Inc., 170 D.P.R. 14 (2007); Pinero v. A.A.A., 146 D.P.R. 890, 901-902 (1998). Véanse, además: Acevedo v. P.R. Sun Oil Co., 145 D.P.R. 752 (1998); Beauchamp v. Holsum Bakers of P.R., 116 D.P.R. 522 (1985); Srio. del Trabajo v. I.T.T., 108 D.P.R. 536 (1979).

 En el caso Hull Dobbs Co. v. Tribunal Superior, 82 D.P.R. 77, 84-85 (1961), interpretando la Ley Núm. 50, este Tribunal determinó que los ejecutivos, profesio-nales y administradores están protegidos contra los despidos injustificados.

 Art. 1 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185a; García v. Aljoma, 162 D.P.R. 572, 585 (2004); Díaz v. Wyndham Hotel Corp., supra, pág. 375. Véase, además, Zeno Santiago y Bermúdez, op. cit., pág. 98.

 G. Caballerías de Torres, Diccionario de Derecho Laboral, Buenos Aires, Ed. Heliasta, 1998, pág. 200.

 Zeno Santiago, El despido y la política social en nuestro estado de derecho, supra, pág. 215.

 Art. 5 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185e.

 A este término jurídico, además, se le conoce como “despido constructivo”, “abandono constructivo” o “despido implícito”.

 Zeno Santiago y Bermúdez Pérez, op. cit., pág. 100.

 29 U.S.C.A. sees. 151-169; G.W. Bohlander, Constructive Discharge-A.K.A. Was It a Quit or Discharge? Understanding The Doctrine and Prevention of Constructive-Discharge-Discharge Cases, 8 J. Individual Employment Rigths 49 (1999-2000).
Esta ley trataba de impedir que se discriminara, en la contratación o la tenencia de un empleo, contra aquellos empleados que querían formar, asistir o apoyar la organización de un sindicato, o intentaban negociar colectivamente mediante sus representantes. 29 U.S.C.A. sec. 158(a)(3). De esta forma, los patronos podrían ser encontrados culpables de cometer prácticas ilícitas configurando un despido cons-tructivo, contra los empleados unionados, bajo las secciones 8(a)(3) y 8(a)(1), 29 U.S.C.A. 158(a)(1) y (a)(3). En esta última sección, los cargos se referían a intentos del patrono de interferir, restringir o ejercer coerción contra los empleados que ejer-cían los derechos que le concedía el estatuto. Bohlander, op. cit, págs. 49-50.

 Sterling Corset Co., Inc., 9 N.L.R.B. 858, 865 (1938), citado en Pennsylvania State Police v. Suder’s, 542 U.S. 129, 141-143 (2004); I.M. Saxe, Constructive Discharge Under the ADEA: An Argument for the Intent Standard, 55 (Núm. 6) Ford-ham L.Rev. 963 (mayo 1987).

 “There are two elements which must be proven to establish a constructive discharge. First, the burdens imposed upon the employee must cause, and be intended to cause, a change in his working conditions so difficult or unpleasant as to force him to resign. Second, it must be shown that those burdens were imposed because of the employee’s union activities.” Crystal Princeton Refining Co., 222 N.L.R.B. 1068 (1976), según citado en G.W. Bohlander, op. cit. pág. 50. Véase, además, Sure-Tan, Inc. v. NLRB, 467 U.S. 883 (1984), donde el Tribunal Supremo federal afirma que el intento de un patrono de forzar la renuncia de su empleado es un elemento signifi-cativo en determinar los resultados de los casos de despido constructivo atendidos *727 por la Junta. Bohlander, supra, pág. 50. En este caso, el Tribunal Supremo de Esta-dos Unidos avaló el despido constructivo en el contexto laboral, según establecido por la N.L.R.B. De esta forma, siguió el patrón establecido por los tribunales estatales y federales.

 Equal Employment Opportunities Act, Civil RigthsAct of 1964 (42 U.S.C.A. sec. 2000e et seq.); Bohlander, supra, págs. 50-51; Pennsylvania State Police v. Su-ders, supra; H.E. Sullivan III, Labor Law, Employment discrimination: Employer that knowingly permits acts of discrimination so intolerable that reasonable employee subject to them would resign may be liable for Constructive Discharge under Title VII, 30 (Núms. 3-4) Villanova L.Rev. 1028-1039 (junio 1985).

 El estándar de la persona razonable es aceptado por los distritos Primero, Segundo, Tercero, Quinto, Sexto, Noveno, Décimo, Undécimo y el de Columbia. Mien-tras, el estándar de la intención patronal sólo es apoyado por el cuarto y octavo circuito de apelaciones. Bohlander, supra, pág. 51.

 Pennsylvania State Police v. Suders, supra, págs. 133-134 y 147, citando también a Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

 Bohlander, supra, pág. 55, citando a Heagney v. University of Washington, 26 Fair Employment Practice Case 438 (9no Cir. 1981).
Los tribunales estatales y federates han definido el concepto de “condiciones de trabajo intolerable” como aquellas condiciones de empleo onerosas, impuestas por el patrono, que son insoportables para cualquier persona razonable y que le fuerza a renunciar involuntariamente. Estas condiciones onerosas se concretizan cuando el patrono, en vez de crear condiciones razonables de empleo, coloca al empleado en la disyuntiva de aceptar las condiciones intolerables impuestas a sus condiciones de trabajo o renunciar. En esta situación es perfectamente comprensible que un em-pleado anticipe el daño que pueden ocasionarle las condiciones onerosas previstas para un futuro cercano y decida renunciar antes de someterse a las nuevas condicio-nes de trabajo impuestas por su patrono. Meyer v. Brown & Root Const. Co., 661 F.2d 369 (5to Cir. 1981), citado en G.W. Bohlander, supra, pág. 53.

 Bohlander, supra, pág. 55, citando a Paroline v. Unisys Corp., 879 F.2d 100, 114 (4to Cir. 1989). Actualmente, aun según el estándar de intención patronal, para probar la intención del patrono de despedir al empleado no es necesario demostrar que el patrono conscientemente intentaba forzar al empleado a renunciar. Por lo cual, cuando un patrono niega que conscientemente esté tratando de hacer que su empleado renuncie, al patrono necesariamente se le debe adjudicar la intención de esperar la consecuencia razonablemente previsible de sus actuaciones. Martin v. Cavalier Hotel Corp., 48 F.3d 1343 (4to Cir. 1995); Hukkanen v. Intern. Union of Operating Engineers, 3 F.3d 281 (8vo Cir. 1993); Derr v. Gulf Oil Corp., 796 F.2d 340 (10mo Cir. 1986), todos citados en G.D. Mesritz, Constructive Discharge and Employer Intent: Are the Courts Split over a Distinction without a Difference?, 21 (Núm. 4) Emp. Rel. L.J. 92-94 (Primavera 1996).
Esto básicamente elimina la distinción entre el estándar de persona razonable y el de intención patronal porque ambas utilizan un examen objetivo. El primero ba-sado en la razonabilidad del empleado que renuncia y el segundo en que la renuncia sea una consecuencia razonablemente previsible a las acciones del patrono. En otras palabras, el despido constructivo se configura cuando el patrono podía razonable-mente prever las consecuencias de sus acciones. Mesritz, supra, págs. 92 y 102.

 Vélez de Reilova v. R. Palmer Bros., Inc., 94 D.P.R. 175, 178 (1967). Véanse, además: Nazario v. E.L.A., 159 D.P.R. 799, 810 (2003); S.L.G. Hernández-Beltrán v. TOLIC, 151 D.P.R. 754, 777 (2000); Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 183 (1994).

 Zeno Santiago y Bermúdez Pérez, op. cit., pág. 100.

 Guía Revisada para la Aplicación de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, Departamento del Trabajo y Recursos Humanos, 21 de septiem-bre de 2000, pág. 24 (Guía Revisada).

 íd.

 íd.

 Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178, 198, 208-209 (1998).

 Guía Revisada, supra, pág. 25.

 Bohlander, supra, pág. 54.

 R.H. Baxter Jr. y J.M. Farell, Constructive Discharge: When Quitting Jeans Getting Fired, 7 Emp. Rel. L.J. 352-353.

 Zeno Santiago y Bermúdez Pérez, op. cit, pág. 102; Zeno Santiago, El des-pido y la política social en nuestro estado de derecho, supra, pág. 219. Véase, además, Baxter, Jr. y Farell, supra, págs. 346-368.

 Delgado Zayas, op. cit., pág. 122.

 En un contexto de despido constructivo por discrimen, el Tribunal Supremo de Estados Unidos expresó:
“[W]e know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons ... have been eliminated as possible reasons for the employer’s actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration ....” Furnco Construction Corp. v. Waters et al., 438 U.S. 567, 577 (1978).

 Guía Revisada, supra, pág. 25.

 íd.

 No comparto la conclusión a la que llega la opinión de conformidad referente a que en la ponderación de si un despido es constructivo, además del elemento de la onerosidad y de la renuncia como única opción, se deben evaluar cada uno de los factores que el Departamento del Trabajo y Recursos Humanos menciona para esta-blecer si fue válida la actuación del patrono. Esta información que provee el Depar-tamento sólo son guías interpretativas de la Ley Núm. 80. No es un reglamento aprobado con el rigor que exige la Ley de Procedimiento Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.), 3 L.P.R.A. see. 2101 et seq., y validado por el Departamento de Estado que resulte obligatorio al momento de adjudicar una controversia. Por lo cual, la mayoría, al utilizar estas guías, debe analizarlas y apli-carlas en congruencia con los hechos del caso y la finalidad de la Ley Núm. 80 de 1976, según enmendada, que es proteger la tenencia del empleo.

 Art. 2 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185b.

 Id.; Díaz v. Wyndham Hotel Corp., supra, págs. 376-377; Srio. del Trabajo v. G.P. Inds., Inc., 153 D.P.R. 223, 244 (2001); Srio. del Trabajo v. I.T.T., supra, pág. 543; Báez García v. Cooper Labs., Inc., 120 D.P.R. 145, 154 (1987). Véanse, además: Zeno Santiago y Bermúdez Pérez, op. cit., pág. 107; A. Acevedo Colom, Legislación protec-tora del trabajo comentada, 7ma ed. rev., San Juan, [ed. del autor], 2001, pág. 135.

 Art. 3 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185c.

 Art. 3 de la Ley Núm. 80, supra.

 para esto, el patrono tendrá que someter evidencia que demuestre que:
“1. Ha utilizado un mecanismo de evaluación razonable, el cual mide de forma apropiada y objetiva la capacidad del empleado para realizar las funciones del puesto.
*736 “2. De las evaluaciones realizadas surge una diferencia clara o inconcursa a favor de la eficiencia o capacidad de ciertos empleados.
“3. Las funciones del puesto son de tal naturaleza que la diferencia en términos de la capacidad o eficiencia de los empleados conlleva una diferencia económica sus-tancial para la empresa y quizás en la capacidad de subsistencia de ésta.” Guía Revisada, supra, pág. 41. Véase, además, Zeno Santiago y Bermúdez Pérez, op. cit., págs. 132-133.

 Guía Revisada, supra, pág. 40.

 íd.

 Art. 8 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185k; Díaz v. Wyndham Hotel Corp., supra, pág. 378; Báez García v. Cooper Labs., Inc., supra, págs. Í51-152. Véase, además, L.O. Meléndez Dones, Esquemas probatorios: el discrimen intencio-nal al amparo de la Ley Núm. 100 y el Título VII, 34 (Núm. 2) Rev. Jur. U.I.P.R. 239, 251 (2000).

 Exposición de Motivos de Ley Núm. 95 de 30 de julio de 2007.

 Art. 8 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185k(a).

 Díaz v. Wyndham Hotel Corp., supra, págs. 378-379, 388; Belk v. Martínez, 146 D.P.R. 215, 231 (1998); Srio. del Trabajo v. I.T.T., supra, pág. 543; Acevedo Colom, op. cit., pág. 192. Véase, además, Regla 10 de Evidencia, 32 L.P.R.A. Ap. IV.

 Regla 14 de las de Evidencia, 32 L.P.R.A. Ap. IV.

 Díaz v. Wyndham Hotel Corp., supra, pág. 378; Rivera Águila v. K-mart de P.R., 123 D.P.R. 599, 610 (1989); Srio. del Trabajo v. I.T.T., supra, pág. 543.

 Ibáñez v. Molinos de P.R., Inc., 114 D.P.R. 42, 53 (1983).

 Belk Arce v. Martínez, supra, págs. 231-232.

 Véase Decisión referente al Traslado de Tienda por Motivo de Cierre de Tienda Plaza Guayama, Apéndice de la Petición de certiorari, pág. 99.

 Estudio de Antigüedad, Apéndice de la Petición de Certiorari en el Tribunal de Apelaciones, supra; Contrato de Trabajo Probatorio de la señora Sánchez Vadi, Apéndice de la Petición de Certiorari del Tribunal de Apelaciones, pág. 63. El con-trato de la señora Lugo no formaba parte del expediente del caso.

 Esto debido a que no hay evidencia en el expediente que valide el uso del criterio de eficiencia o capacidad para sostener que se mantuviera a la empleada de sólo seis meses de trabajo.